No. 2—08—1011
Opinion filed January 28, 2011

IN THE

APPELLATE COURT OF ILLINOIS

SECOND DISTRICT

| | | |
|---|---|---|
| JERRY H. BYRD and MARYLOU E. BYRD, | ) ) ) | Appeal from the Circuit Court of McHenry County. |
| Plaintiffs-Appellants, | ) ) | |
| v. | ) ) | No. 07—MR—40 |
| BRIAN A. HAMER, Director of Revenue, and THE DEPARTMENT OF REVENUE, | ) ) ) | The Honorable Maureen P. McIntyre, |
| Defendants-Appellees. | ) ) | Judge, Presiding. |

JUSTICE BIRKETT delivered the judgment of the court, with opinion.
Presiding Justice Jorgensen and Justice Bowman concurred in the judgment and opinion.

**OPINION**

Plaintiffs, Jerry and MaryLou Byrd (Byrds), brought an action for administrative review of the decision of the Illinois Department of Revenue (Department) that the Byrds' gambling winnings for tax years 1999, 2000, 2001, and 2002 are taxable income under Illinois law and that their gambling losses for those years are not deductible under Illinois law. The Byrds contend that the Department erred in finding that they were not engaged in gambling as a trade or business for those tax years but were recreational gamblers and, as such, not entitled to a deduction for gambling losses. The Byrds alternatively raise various constitutional challenges to the tax scheme in Illinois that permits deduction of gambling losses for individuals who gamble as a trade or business but not for

those who gamble for recreation. For the reasons stated below, we confirm the decision of the Department.

## I. BACKGROUND

The following is a sketch of the relevant facts, which will be set forth in greater detail below. The Byrds, who are married, gambled at several casinos during tax years 1999, 2000, 2001, and 2002. Most of their gambling occurred at Hollywood Casino in Aurora and Grand Victoria Casino in Elgin. The Byrds played mostly slot machines, and they accumulated substantial winnings and losses. The Byrds filed Illinois and federal tax returns for years 1999, 2000, and 2001, and a federal return for year 2002. As of the Department's decision in this case, the Byrds had not filed a 2002 Illinois return. After the Department reviewed the Illinois returns, it sent the Byrds a series of original and amended tax deficiency notices (NODs) claiming that the Byrds' reported income on their Illinois returns for 1999 to 2001 improperly excluded their gambling winnings. The Department likewise claimed that the Byrds' Illinois tax liability for 2002 included tax on their gambling winnings for that year. The Byrds challenged the NODs, and the Department ultimately found the Byrds liable for $60,382 in additional taxes. The trial court affirmed the Department's decision, and the Byrds appealed to this court.

### A. Treatment Under Federal and Illinois Law of Gambling Winnings and Losses

The facts of this case are best understood against the backdrop of federal and Illinois tax law concerning gambling winnings and losses. We begin by delineating that tax scheme.

The parties agree that Illinois tax law has no specific provision for gambling winnings or losses. Nevertheless, as the parties recognize, there are tax consequences for an Illinois taxpayer who incurs gambling winnings or losses. Part of the reason gambling has tax consequences for an Illinois taxpayer though Illinois law makes no specific provision for them is that the Illinois income tax law

" 'piggy-backs' onto the federal calculation of income and uses federal taxable income as the premise for tax liability." *Rockwood Holding Co. v. Department of Revenue*, 312 Ill. App. 3d 1120, 1124 (2000). By virtue of this derivative relationship, Illinois taxpayers can enjoy the benefit of certain federal income tax exclusions or deductions that have no express parallel under Illinois law. See *Bodine Electric Co. v. Allphin*, 81 Ill. 2d 502, 509 (1980). This scheme works as follows for gambling winnings and losses. The Internal Revenue Code (IRC) (26 U.S.C. §61(a) (2006)) defines "gross income" for purposes of federal taxation as "all income from whatever source derived." Gambling winnings must be reported as gross income on the federal tax return. *McClanahan v. United States*, 292 F.2d 630, 631-32 (5th Cir. 1961). The only component of gambling winnings that a federal taxpayer may exclude from gross income is the cost of winning wagers, which is nontaxable as the recovery of capital. *Shollenberger v. Commissioner of Internal Revenue*, 98 T.C.M. (CCH) 667, 669 (2009) (a gambler's "gross income from a wagering transaction should be calculated by subtracting the bets placed to produce the winnings, not as a deduction in calculating adjusted gross income or taxable income but as a preliminary computation in determining gross income"); *Hochman v. Commissioner*, 51 T.C.M. (CCH) 311, 313 (1985) ("[t]o the extent that the cost of his winning ticket is included in the payoff which [the taxpayer] receives at the cashier's window on a winning race, *** [the taxpayer] has only recovered his capital, and is entitled to exclude the amount of that winning ticket from his gross receipts in order to arrive at gross income within the meaning of [the IRC]"). The cost of a wager that did not result in a win is considered a loss and is not excluded from gross income. *Shollenberger*, 98 T.C.M. (CCH) at 669. As one treatise has noted:

"The cost of placing a winning bet or wager isn't a deductible loss, but is rather a tax-free return of capital. The amount of income from a winning bet or wager is the full amount

of the winnings less the cost of placing that winning bet or wager." 33A Am. Jur. 2d *Federal Taxation* §13258.1 (2005).

To illustrate:

> "C plays a slot machine that takes $5 tokens. He makes ten 'pulls.' He loses nine times, but on the tenth pull, he wins $100. The amount of his winning income is $95—the $100 win, less the cost of the $5 winning token. The $45 spent on losing tokens is a gambling loss." *Id.*

While gambling losses are not excluded from gross income, they are deductible under federal law with certain restrictions. How this deduction figures in the computation of federal tax depends on whether the gambling was recreational or rather in the nature of a trade or business. Gambling losses that qualify as trade or business losses are recorded on Schedule C of the federal tax return and are deducted from the taxpayer's "gross income" or "total income" in determining "adjusted gross income." 26 U.S.C. §62(a)(1) (2006) (calculation of adjusted gross income takes into account "deductions *** which are attributable to a trade or business carried on by the taxpayer"); 26 U.S.C. §162 (2006) ("There shall be allowed as a deduction all the ordinary and necessary expenses paid or incurred during the taxable year in carrying on any trade or business ***."); *Torpie v. Commissioner*, 79 T.C.M. (CCH) 2064 (2000). As such, they are an "above the line" deduction. *LaPlante v. Commissioner*, 98 T.C.M. (CCH) 305, 307 (2009). Gambling losses not qualifying as trade or business losses do not figure in the calculation of total or gross income. *Id.* Rather, they are factored later, and thus are a "below the line" deduction. *Id.* Losses in casual gambling are among the itemized deductions taken from adjusted gross income to arrive at "taxable income." *Id.*; see 26 U.S.C. §63(a) (2006). This is a less favorable deduction than if those losses were deducted in the determination of gross or total income, as they would be in the case of a professional gambler.

*LaPlante*, 98 T.C.M. (CCH) at 307. Regardless, however, of whether the taxpayer is a professional or a casual gambler, "Losses from wagering transactions shall be allowed only to the extent of gains from such transactions." 26 U.S.C. §165(d) (2006).

As the parties agree, the Illinois Income Tax Act (Act) (35 ILCS 5/101 *et seq.* (West 2008)) has no specific provision for gambling winnings and losses. By virtue, however, of the Act's carryover of income figures from the taxpayer's federal return, the Act incorporates for state tax purposes the federal tax treatment of gambling winnings and losses. The incorporation is not wholesale, however. The starting figure for computing income tax under the Act is the taxpayer's "base income," which is "an amount equal to the taxpayer's adjusted gross income." 35 ILCS 5/203(a)(1) (West 2008). "[A]djusted gross income" is in turn defined as the "amount of *** adjusted gross income *** properly reportable for federal income tax purposes for the taxable year under the provisions of the Internal Revenue Code" (35 ILCS 5/203(e)(1) (West 2008)). Thus, the Act takes federal adjusted gross income as the "starting point" for calculation of state income tax. *Bodine*, 81 Ill. 2d at 510. "To the extent that federally allowed deductions enter into the computation of this figure, they are relevant under the *** Act." *Id.* However, the carryover of federal adjusted gross income does not create a set of Illinois deductions parallel to the federal deductions. *Id.* Rather, section 203(a)(2) of the Act (35 ILCS 5/203(a)(2) (West 2008)) provides that adjusted gross income as carried over from the federal return may be modified by the addition of certain amounts. Some of these are add-backs of amounts deducted from federal gross income to reach adjusted gross income. For instance, section 203(a)(2)(D) (35 ILCS 5/203(a)(2)(D) (West 2008)) provides for an add-back in "[a]n amount equal to the amount of the capital gain deduction allowable under the Internal Revenue Code, to the extent deducted from gross income in the computation of adjusted gross income." Also added back is (unsurprisingly) an amount equal to the amount of tax imposed

under the Act "to the extent deducted from gross income in the computation of adjusted gross income for the taxable year." 35 ILCS 5/203(a)(2)(B) (West 2008). Section 203 provides no add-back, however, for trade or business losses deducted from federal gross income to reach federal adjusted gross income. If section 203 does not specify a certain add-back, it does not exist in the Act. See 35 ILCS 5/203(h) (West 2008) ("Except as expressly provided by this Section there shall be no modifications or limitations on the amount of income, gain, loss or deduction taken into account ***."). Thus, a deduction for gambling losses by professional gamblers is *sub silentio* incorporated into the concept of adjusted gross income under the Act.

The Act does not in the same respect incorporate a deduction for losses by *casual* gamblers. The starting point for the Act is federal adjusted gross income, but the itemized deduction for losses incurred in casual gambling comes later on the federal return and applies against adjusted gross income to calculate taxable income. See 26 U.S.C. §63(a) (2006); *LaPlante*, 98 T.C.M. (CCH) at 308. Thus, the deduction appears too late in the computation of federal tax to be carried over onto the Illinois return. Moreover, though section 203 of the Act provides for certain deductions from adjusted gross income, it does not explicitly allow a deduction of losses by casual gamblers. The omission is decisive. See 35 ILCS 5/203(h) (West 2008) (no modification of adjusted gross income unless expressly permitted in section 203); *Bodine*, 81 Ill. 2d at 509 (Act makes no express provision to "allow a State taxpayer to compute a net operating loss on a State tax return").

To summarize, a deduction for losses incurred in professional gambling is carried over onto a taxpayer's Illinois return, and the Act does not require that the deduction be added back in computing Illinois tax. By contrast, a deduction for losses incurred in casual gambling is not carried over onto the Illinois return and the Act itself does not provide for such a deduction. This tax scheme is the context for the Byrds' claims in this case.

B. Factual Background

The relevant facts are not disputed. The Byrds filed Illinois and federal income tax returns for tax years 1999, 2000, and 2001, and a federal return for tax year 2002. As of the Department's decision in this case, the Byrds had not filed a 2002 Illinois return. On each of the four federal returns in question, the Byrds reported wages, gambling winnings, and gambling losses. The Byrds reported the winnings as part of their gross income. The Byrds claimed the gambling losses not as trade or business losses, but as itemized deductions taken from adjusted gross income. The Byrds' federal tax returns showed the following figures for the four years at issue:

| Tax Year | Wages | Gambling Winnings | Adjusted Gross Income[1] | Gambling Losses[2] |
|---|---|---|---|---|
| 1999 | $209,195.12 | $739,034.84 | $207,141.30 | $739,034.84 |
| 2000 | $259,441.32 | $530,710.00 | $788,432.00 | $528,635.00 |
| 2001 | $250,508.18 | $47,450.00 | $295,351.00 | $47,450.00 |
| 2002 | $270,598.42 | $132,585.00 | $400,224.00 | $132,585.00 |

All four returns claimed to state gambling winnings as reported on Internal Revenue Service Form W-2G. A casino must submit Form W-2G to the IRS whenever it makes a payout of $1,200 or more from a slot machine. See Treas. Reg. §7.6041—1 (____). The Department acknowledges in this appeal that the Byrds' gambling winnings reported on their federal returns accurately reflect the gambling winnings reported to the IRS on Form W-2G.

---

[1]Included in adjusted gross income were amounts besides wages and gambling winnings.

[2]In every year but 2000, the Byrds' gambling losses equaled or exceeded their winnings.

The Byrds' Illinois returns for years 1999-2001 each required them to carry over their federal adjusted gross income as the starting point for calculation of Illinois tax. See 35 ILCS 5/203(a)(1), (e) (West 2008). The Byrds reported the following adjusted gross income for those years:

| Tax Year | Adjusted Gross Income |
|---|---|
| 1999 | $207,141.30 |
| 2000 | $250,901.00 |
| 2001 | $259,797.00 |

Between 2002 and 2005, the Department issued NODs to the Byrds for underreporting their income on their Illinois returns. For tax years 1999 and 2001, the Department issued an original NOD and one amended NOD. For tax years 2000 and 2002, the Department issued an original NOD and two amended NODs. The NODs claimed that the Byrds failed to report the following income to Illinois and that they owed the following additional tax (including interest).

| Tax Year | Original NOD: Omitted income/total tax deficiency | 1st Amended NOD: Omitted income/total tax deficiency | 2nd Amended NOD: Omitted income/total tax deficiency |
|---|---|---|---|
| 1999 | $739,042 / $26,232 | $3,288,589 / $159,902 | ------ |
| 2000 | $528,635 / $18,230 | $1,582,687 / $68,625 | $3,672,687 / $159,517 |
| 2001 | ????[3] / $1,644 | $1,351,957 / $52,857 | ------ |
| 2002 | $400,224 / $14,276 | $1,907,187 / $70,129 | $1,272,992 / $46,948 |

[3]The original NOD for 2001 did not state what amount of income was claimed to have been omitted.

According to the original NODs, the Byrds owed a total deficiency of $60,382. According to the amended NODs, the Byrds omitted $9,586,225 in total income and owed $419,224 in total deficiency.

The parties appear to agree as to why the amended NODs show vastly greater amounts of unreported income than the original NODs. According to the parties, the original NODs were based on simple discrepancies between the Byrds' adjusted gross income as reported on their federal returns and as represented on their Illinois returns. The gambling winnings reported on the federal returns were based on the W-2G forms submitted by the casinos that the Byrds patronized during the relevant years. As noted, a casino must issue a W-2G form whenever a slot machine makes a payout of $1,200 or more.

During discovery, however, the Byrds tendered documents that purported to record all payouts (not just those of $1,200 or more) that the Byrds received from Hollywood Casino and Grand Victoria Casino, where the Byrds gambled the most during the relevant years. These casinos had issued the Byrds "players cards" that enabled the casinos to electronically record the Byrds' activity at slot machines. The documents tendered during discovery included year-end reports from Hollywood Casino and Grand Victoria Casino. The reports, which were admitted into evidence at the administrative hearing and are part of the appellate record, contain year-end figures based on activity recorded by use of the players cards. These reports show columns for "coin in," "coin out," and "jackpots." The "coin in" totals reflect all sums the Byrds paid into the slot machines. The reports show separate totals for the "coin out" and "jackpots." While no one from the casinos testified at the administrative hearing, plaintiff Jerry Byrd testified that the "coin out" and "jackpots" totals are exclusive of each other and must be combined to determine the total sums paid out to the Byrds from the slot machines. (The "jackpots," notably, comprise more than those payouts that

qualify for reporting via Form W-2G, for several of the jackpots are below the $1,200 minimum.) When combined, the "coin out" and "jackpots" columns for each year exceed the aggregate W-2G payouts for that year. Based on the casino reports, the Department issued amended NODs claiming markedly higher levels of unreported income and tax deficiencies than in the original NODs.

The Byrds contested the amended NODs, and the case proceeded to a hearing before an administrative law judge (ALJ) on April 19, 2006. The parties stipulated to the authenticity of a large body of documents including: (1) the Byrds' federal tax returns for 1999-2002, and their Illinois returns for 1999-2001; (2) W-2G forms from Hollywood Casino, Grand Victoria Casino, Harrah's Casino in Joilet, and Rio Suite Hotel & Casino in Las Vegas; (3) year-end reports from Hollywood Casino and Grand Victoria Casino; (4) records of ATM and credit card transactions at the casinos; and (5) records of markers, or lines of credit, extended to the Byrds by the casinos.

The sole witness at the hearing was Jerry Byrd. Jerry testified that he has been employed in the graphic arts field for 38 years and that his current position is manager of a graphic arts firm. Jerry held that same position during tax years 1999 to 2002.[4] Jerry testified that, during the tax years in question, his wages from his managerial position ranged between $210,000 and $250,000 per year. (Jerry's W-2 forms for these years show wages between $209,195 and $270,598.) During this period, the Byrds' "primary income" came from Jerry's employment. His wife, MaryLou, did not work outside the home.

Jerry testified that he was first exposed to gambling in 1998 on a golf trip to Las Vegas. Jerry testified that, from 1999 to 2002, he and his wife frequented casinos and played mostly slot machines. The Illinois casinos they patronized most were Grand Victoria Casino and Hollywood Casino. Jerry

---

[4]In their brief, the Byrds confirm that this employment was full time.

testified that he and his wife went to Grand Victoria Casino on a weekly and sometimes daily basis. (Jerry did not say how often he or his wife went to Hollywood Casino.) The Byrds played mostly slot machines. Jerry explained that Grand Victoria Casino and Hollywood Casino each issued Jerry and his wife "players cards" that enabled the casinos to electronically record the Byrds' activity at slot machines. Jerry testified that the players cards allow him to keep careful records of his gambling activity. Jerry explained that there is no electronic recording of activity at table games in casinos. Patrons are not allowed to take notes while paying table games. Rather, casino employees monitor the tables and give a patron a win-loss tally when he leaves a table. Jerry testified that this tally is just "an estimation" and is not for tax purposes. Jerry further noted that W-2G forms are not issued for table winnings.

Jerry identified the reports from Hollywood Casino and Grand Victoria Casino showing yearly totals of "coin in," "coin out," and "jackpots" from their slot machines for the years in question. The records from Grand Victoria identify each date the Byrds had gaming activity at the casino. According to these records, the Byrds were active at Grand Victoria on 97 separate dates in 1999, 68 dates in 2000, 51 dates in 2001, and 53 dates in 2002. The records from Grand Victoria do not record dates of activity. The reports from both casinos, however, show yearly totals of money the Byrds paid into slot machines (the "coin in" totals) and money dispensed to them (the "coin out" and "jackpots" totals combined). As reported, these yearly totals were:

| Year | Grand Victoria Casino - Money In | Grand Victoria Casino - Money Out | Net |
|------|------|------|------|
| 1999 | $2,059,377.00 | $1,955,457.00 | -$103,920.00 |
| 2000 | $1,438,681.00 | $1,324,079.00 | -$114,602.00 |
| 2001 | $503,494.90 | $473,627.40 | -$29,867.50 |

| 2002 | $777,316.70 | $759,419.40 | -$17,897.30 |
| Total | $4,778,869.60 | $4,512,582.80 | -$266,286.80[5] |

| Year | Hollywood Casino - Money In | Hollywood Casino - Money Out | Net |
|---|---|---|---|
| 1999 | $980,339.00 | $999,410.00 | +$19,071.00 |
| 2000 | $2,416,299.00 | $2,321,258.00 | -$95,041.00 |
| 2001 | $940,231.00 | $876,981.00 | -$63,250.00 |
| 2002 | $665,718.00 | $633,247.00 | -$32,471.00 |
| Total | $5,002,587.00 | $2,741,896.00 | -$171,691.00 |

The Byrds' total net losses at Grand Victoria Casino and Hollywood Casino for 1999 to 2002 were $437,977.80.

Jerry testified that, despite their "substantial losses," the Byrds "enjoy" gambling:

"We put five kids through college, nobody at home. We make a lot of money at my—my job position and [gambling] is an activity that we enjoy and have enjoyed doing ***."

Jerry testified that the money the Byrds spend at casinos comes from his wages. Jerry noted that the Byrds pay their bills regularly and have never been behind on their mortgage.

Jerry described his approach to playing slot machines. Byrd likened playing slots to trading stocks as both are combinations of skill and luck. Jerry explained that "laws of probability" are programmed into each slot machine and that it is possible to predict how soon a machine will pay out:

---

[5]According to the Byrds' tabulation, their net loss from Grand Victoria was $30,754. Our own calculation shows a far greater net loss. This does not, however, affect our analysis of the Byrds' claims.

"[T]he slot machines are initiated so that every 100 spins they recycle and start the probability over again ***. So if I'm playing a slot machine, I watch what it's doing. I count every time the [reel] spins, and, for instance, I wouldn't walk away from a machine that hasn't paid anything if I was at like an 80 or 90 count. I would put more money in, finish out that count of 100 because my odds of hitting something in those last ten or 15 spins are—are almost twice as great as the earlier spins and then you start over again. So yes, there is different levels of skills.

There are people that peek through the corner on a machine and look at the total number. Top number says coin in, the bottom number says coin out, and they look at the third number as whether it's positive or negative. If a machine is negative, that means it's paying out more coins tha[n] it's taking in and then it's up to you. Do you think you want to play a machine that is already overpaid or do you think there is going to be continued overpay[?]

So it was—there is a lot of thought that goes into it. It's not just walking up and randomly sitting down and you putting whatever in and hitting the spin button.

Based on where you're at in the count on the machine, if it's a three coin machine and you're on the last—your count is at 80, then you will know to playing two or three coins on the last spin if you were playing minimal coins on the earlier spin.

And then if you're playing a machine that has a—a progressive jackpot, you typically wouldn't waste your time playing one coin. You select your machine, you read the numbers on the side of the machine and then you're playing that machine and you play three coins at a time because that increases your—your opportunity to hit a large jackpot."

Byrd also testified to how he manages his money at the casinos. Byrd testified that he does not carry cash into a casino. Instead, he withdraws cash from an ATM inside the casino and limits himself to that amount so that he knows how much money he gambled that day. For recordkeeping purposes, Byrd compares his ATM receipts for a particular day with reports from the casinos showing his activity for that day. Byrd acknowledged that, though as a matter of practice he never uses ATM cash other than at the casino where he withdraws it, he is nonetheless free to use that cash wherever he wishes. Byrd testified that he also funds his gambling by use of markers, which are basically cash advances that a casino makes upon verification of adequate funds in the patron's bank account. Byrd testified that, though there is no bar to a patron using funds from a marker outside the casino, if the casino does not see gambling activity in the amount of the marker, it will revoke the patron's marker privileges. One of the means by which the casino monitors the activity of marker holders is through the players cards. Byrd explained that, when his ATM and marker limits are exceeded, he uses his credit card to obtain cash. The Byrds introduced into evidence documentation of their ATM withdrawals, marker extensions, and credit card transactions at Hollywood Casino, Grand Victoria Casino, and other casinos the Byrds patronized during the years 1999-2002.

In their briefs to the ALJ, the Byrds first argued that they gambled on a professional basis during the years in question and hence could deduct their losses as business losses. The Byrds compared themselves to the taxpayer in *Commissioner of Internal Revenue v. Groetzinger*, 480 U.S. 23 (1987), whose gambling the United States Supreme Court held was in the nature of a trade or business. The Byrds argued in the alternative that, if the Department determined that they were recreational gamblers, they were still entitled to a deduction for their losses. To this end, the Byrds contended that the Act, which incorporates the federal deduction for professional gamblers but does not follow federal tax law in allowing recreational gamblers a deduction, violates federal and Illinois

constitutional guarantees of due process and equal protection as well as the Illinois constitutional guarantee of uniformity of taxation. The Byrds argued that the Illinois treatment of gambling losses is on its face a violation of due process because (1) it taxes all "coin out," even that which is a payback of funds that have already been subject to income tax, and so results in double taxation; and (2) it bears "no reasonable relationship to any realistic concept of income" because, to the extent that a recreational gambler's winnings are offset by losses, they cannot be considered true income.

The Byrds further argued that the Act violates due process as applied to them because, though they suffered "explosive" losses far in excess of their winnings, the Act nonetheless would impose on them, according to the amended NODs, a half-million-dollar tax burden. The Byrds also argued that the Act violates equal protection and tax-uniformity prescriptions because it creates three unreasonable classifications: (1) between professional gambling and recreational gambling; (2) between slot machine play, which generates W-2G forms, and other forms of gambling such as table games, which do not have such reporting requirements; and (3) between recreational gambling, for which the Act allows no loss deductions, and stock trading, for which the Act allows loss deductions.

The ALJ issued his recommended disposition, which was later adopted by the Department. In the adopted decision, the Department rejected all of the Byrds' contentions. The Department first found that the Byrds were not professional gamblers and so their losses did not qualify as deductible trade or business losses:

"Since [the Byrds] are recreational gamblers and not professional gamblers, they are, in essence, engaged in a very expensive hobby. *** The money they spend on losing wagering transactions constitutes part of the expenses they choose to make when engaging in their chosen hobby. Some of the other expenses associated with their hobby might be, for example, travel and hotel expenses when they go to Las Vegas to gamble. They incur such

expenses for recreation; for fun. [The Byrds] pay the expenses associated with their hobby using income Jerry Byrd earns in the form of wages, as well as the gain that [the Byrds] earn when they have winnings from their hobby."

As for the constitutional questions, the Department noted that it had no power to declare any part of the Act unconstitutional. See *Cinkus v. Village of Stickney Municipal Officers Electoral Board*, 228 Ill. 2d 200, 214 (2008) ("To be sure, an administrative agency lacks the authority to declare a statute unconstitutional, or even to question its validity."). The Department nonetheless noted that it would have upheld the Act if it had the power to review its constitutionality.

Addressing first the due process argument, the Department opined that the Act is not facially invalid, because it contains a failsafe provision mandating an exclusion from Illinois taxation for any "amounts *** exempt from taxation by this State either by reason of its statutes or Constitution or by reason of the Constitution, treaties or statutes of the United States" (35 ILCS 5/203(a)(2)(N) (West 2008)). Impliedly addressing and rejecting the Byrds' double-taxation argument, the Department noted that, in reporting gambling winnings for federal total income or gross income, a federal taxpayer is permitted to exclude the cost of the winning wager as the return of capital.[6]

As for the as-applied due process claim, the Department disagreed with the Byrds that there was no rational ground for the Act to consider all gambling winnings as income despite any offsetting losses:

"[T]here is nothing irrational about being able to distinguish between winning wagering transactions and losing wagering transactions. Winning wagering transactions produce

---

[6]The Department found that the Byrds waived their opportunity to take this exclusion because they did not take it on their federal returns.

taxation income [citations], and losing wagering transactions—by definition—are not related to a winning wagering transaction.

Further, [the Byrds] fail to cite any case holding that the United States or Illinois Constitutions have granted to recreational gamblers the right to shield from taxation the amounts they choose to spend on gambling. This is not surprising, since it would be hard to imagine that a constitutional right exists to guarantee to persons the ability to shield from state taxation certain of the amounts they choose to spend on hobbies. Thus, there seems nothing irrational about the Illinois General Assembly's policy decision to not grant an express deduction for some hobbyists (recreational gamblers) for certain hobby expenses (amounts spent on gambling losses).

* * *

*** Every gain from a winning gambling transaction constitutes an accretion of wealth that is includable within the definition of gross income and, for recreational gamblers, such amounts are included within their [adjusted gross income]."

As for the Byrds' equal protection argument, the Department noted that the Act simply follows Congress's classification for tax purposes between business and nonbusiness, and that the "United States Supreme Court has consistently upheld Congress' power to create such classifications." As for the different reporting requirements for different forms of gambling, the Department noted that these, too, are creatures of federal law, specifically Department of Treasury regulations, and that the Byrds failed to explain how these reporting requirements violated their equal protection rights.

The Department addressed last the Byrds' argument that the Act violates the Illinois Constitution's guarantee of uniformity of taxation. The Department relied again on the fact that the

distinction between business and nonbusiness was created by federal law and simply followed by the Act. This classification, the Department noted, has been upheld by federal courts and by the Illinois Supreme Court in *Thorpe v. Mahin*, 43 Ill. 2d 36 (1969). The Department further noted that there is no deduction under Illinois law for losses incurred in any kind of recreational gambling, and so the Act creates no classification between different forms of gambling.

After discussing (in *dicta*, necessarily) the Byrds' constitutional challenges, the Department went on to address an evidentiary matter, which, the Department observed, would moot the constitutional issues. The Department wrote:

> "Most of [the Byrds'] constitutional arguments are premised upon the tax proposed in the amended NODs, and because of the manner by which the Department calculated the tax proposed to be due in the amended NODs. [Citation.] The propriety of the amended NODs, however, does not require a resolution of any constitutional question. *In re S.G.*, [175 Ill. 2d 471, 479 (1997)] (' "A court should avoid constitutional questions where the case may be decided on other grounds" ')."

The Department noted that the original NODs were based simply on discrepancies between the Byrds' adjusted gross income as reported on their federal returns and as represented on their Illinois returns. The Department explained that the amended NODs, by contrast, were issued after the Department reviewed the reports from Hollywood Casino and Grand Victoria Casino showing the total amount of payouts to the Byrds. The Department then ruled that these year-end reports were not competent evidence, because they contained disclaimers that they were not definitive accounting records. Accordingly, the Department cancelled the amended NODs and based its order on the original NODs showing a total tax deficiency of $60,382.

The Byrds filed in the trial court a petition for administrative review under the Illinois Administrative Review Law (735 ILCS 5/3—101 *et seq.* (West 2008)). The trial court affirmed the Department's decision. The court agreed with the Department that the Byrds' activity during the years in question was not a trade or business:

"[The Byrds] did not pursue gambling full time and did not pursue it for the production of income for a livelihood. [Jerry] testified repeatedly he and [his wife] enjoyed gambling."

The trial court further noted that the Byrds did not claim on their federal returns an "above the line" deduction for their gambling losses, and hence "they in essence acknowledged their status as recreational gamblers."

Unlike the Department, the trial court adjudicated the Byrds' constitutional claims. In rejecting those challenges, the trial court employed much of the same reasons the Department had cited in *dicta*. The court summarily rejected the Byrds' argument that the Act is on its face a violation of due process:

"[The Byrds] have failed to show that the [Act's] use of Federal Adjusted Gross Income as the starting point for computing Illinois taxes was invalid in all circumstances. The Byrds do not argue that the Act has no legitimate regulatory purpose or that there are not procedural protections afforded by the Act."

The court held that the Byrds' as-applied due process challenge failed as well, because the Byrds did not show that the Act's disallowance of a deduction for losses incurred in recreational gambling was not a reasonable means of serving the public interest:

"The Act does allow a limited number of deductions/credits, which include a credit for property taxes, educational expense credit and earned income credit. The Act does not allow for many of the deductions sanctioned under the Federal Income Tax Regulations. For

instance, Illinois does not allow deductions for mortgage interest and charitable [contributions]. Deductions are a matter of legislative grace and not a constitutional requirement. [Citation.] Gambling is not a fundamental constitutional right. A deduction for gambling loss is permissive, but not required under the law."

The trial court also found no merit in the Byrds' equal protection and tax-uniformity challenges. First, the court rejected the Byrds' suggestion that the Act creates an unreasonable classification between gambling and other activities where luck and skill are combined, specifically stock trading. The court reasoned:

"There is a difference between gamblers and day traders and stock investors. Day traders and stock investors are purchasing stocks. They are allowed to offset the cost of their stock. The difference in the taxing method employed is a result of the nature of the transaction."

The court found equally unsound the Byrds' claim that the Act created a distinction between different forms of gambling:

"Both the Federal laws and Illinois laws require gamblers to report all income/winnings. The reporting requirements the casinos must follow [do] differ depending on the gaming activity. *** The reporting requirements may differ given the nature of the types of gambling, but the regulations do not exempt all gamblers from reporting their gambling winnings as income. The [Act] does not create separate classifications for slot machine players and table game players."

The court concluded that the "only classification" made by the Act with respect to gambling is between a professional gambler and a recreational gambler. The court found that this classification "is based on a real and substantial difference." Citing *Thorpe*, the court held that "[t]he distinct

treatment of income earned from a trade or business and income not so earned is not discriminatory policy." The Byrds filed a timely appeal in this court.

## II. ANALYSIS

The Byrds renew before us the arguments they made to the Department. The Byrds raise diverse issues, to which different standards of review apply. As for the Department's decision on whether the Byrds' gambling was in the nature of a trade or business for the years in question, we note that the facts are not in dispute. The only dispute is over the legal effect of those facts, and on this issue we will reverse the Department's determination only if it is clearly erroneous. See *Cook County Republican Party v. Illinois State Board of Elections*, 232 Ill. 2d 231, 243-44 (2009) ("An agency's application of a rule of law to established facts is a mixed question of law and fact and will not be reversed unless it is deemed 'clearly erroneous.' [Citation.]"). A decision is clearly erroneous only if the reviewing court is left with a definite and firm conviction that a mistake has been committed. *Id.* We review *de novo*, however, the Byrds' various constitutional challenges to the Act. See *Du Page County Airport Authority v. Department of Revenue*, 358 Ill. App. 3d 476, 484 (2005) (applying *de novo* standard of review to constitutional issues arising on administrative review).

We address first the Byrds' claim that the Department clearly erred in concluding that the Byrds' gambling activity during tax years 1999 to 2002 did not constitute a trade or business. The Department, we note, seeks to forestall that analysis altogether, arguing that the Byrds are too late in seeking a business loss deduction since they did not claim that deduction in calculating their adjusted gross income on their federal returns. The Department reasons that federal adjusted gross income is the starting figure for computation of Illinois tax, and that the Byrds, unless they amend their federal returns, are bound by their federal adjusted gross income as stated on their current federal returns. We think there is a genuine issue whether the Department is empowered to adjust

a taxpayer's taxable Illinois income by an amount corresponding to federal deductions that the taxpayer failed to claim in computing federal adjusted gross income. Compare 35 ILCS 5/403(a) (West 2008) ("To the extent not inconsistent with the provisions of this Act or forms or regulations prescribed by the Department, each person making a return under this Act shall take into the account the items of income, deduction and exclusion on such return in the manner and amounts reflected in such person's federal income tax return for the same taxable year.") with 35 ILCS 5/203(a)(2)(N) (West 2008) (providing that adjusted gross income shall be reduced by "[a]n amount equal to all amounts included in such total which are exempt from taxation by this State either by reason of its statutes or Constitution or by reason of the Constitution, treaties or statutes of the United States") and *Wolters v. Johnson*, 114 Ill. App. 3d 546, 548 n.1 (1983) (recognizing that section 203(a)(2)(N) allows for "modification in adjusted gross income").

The Department further suggests, however, that, because the Byrds took the deduction on their federal returns for losses sustained in recreational gambling, they are estopped from now characterizing their gambling as a trade or business.

We decline to resolve these issues, as we can just as readily demonstrate that the Department did not clearly err on the merits in finding that the Byrds do not qualify for the federal deduction because their gambling activities for the tax years in question were not in the nature of a trade or business. The Byrds rely solely on *Groetzinger* in claiming that the Department erred. The Supreme Court in *Groetzinger* was asked to determine whether the respondent's gambling for tax year 1978 met the definition of "trade or business" (26 U.S.C. §162(a) (2006)). The Court stated the facts in the case succinctly:

"[Respondent] had worked for 20 years in sales and market research for an Illinois manufacturer when his position was terminated in February 1978. During the remainder of

that year, respondent busied himself with parimutuel wagering, primarily on greyhound races. He gambled at tracks in Florida and Colorado. He went to the track six days a week for 48 weeks in 1978. He spent a substantial amount of time studying racing forms, programs, and other materials. He devoted from 60 to 80 hours each week to these gambling-related endeavors. He never placed bets on behalf of any other person, or sold tips, or collected commissions for placing bets, or functioned as a bookmaker. He gambled solely for his own account. He had no other profession or type of employment.

Respondent kept a detailed accounting of his wagers and every day noted his winnings and losses in a record book. In 1978, he had gross winnings of $70,000, but he bet $72,032; he thus realized a net gambling loss for the year of $2,032.

Respondent received $6,498 in income from other sources in 1978. This came from interest, dividends, capital gains, and salary earned before his job was terminated." *Groetzinger*, 480 U.S. at 24-25.

The Court began its analysis by noting the basic concept of a trade or business as " '[t]hat which occupies the time, attention and labor of men for the purpose of a livelihood or profit.' " *Id.* at 28 (quoting *Flint v. Stone Tracy Co.*, 220 U.S. 107, 171 (1911)). The Court fleshed out the concept:

"[T]o be engaged in a trade or business, the taxpayer must be involved in the activity with continuity and regularity and *** the taxpayer's primary purpose for engaging in the activity must be for income or profit. A sporadic activity, a hobby, or an amusement diversion does not qualify." *Id.* at 35.

The Court emphasized that whether an activity meets these criteria depends on the individual facts of each case. *Id.* at 36. The Court held that gambling, depending on how it is conducted, can meet the test of a trade or business:

> "[I]f one's gambling activity is pursued full time, in good faith, and with regularity, to the production of income for a livelihood and is not a mere hobby, it is a trade or business within the meaning of the statutes with which we are here concerned." *Id.* at 35.

The Court determined that the respondent's gambling activity in 1978 met this standard:

> "Constant and large-scale effort on his part was made. Skill was required and was applied. He did what he did for a livelihood, though with a less-than-successful result. This was not a hobby or a passing fancy or an occasional bet for amusement." *Id.* at 36.

The Byrds argue that their gambling activities for 1999 to 2002 clearly meet *Groetzinger*'s definition of a trade or business. They claim they gambled with the "continuity and regularity" that *Groetzinger* requires of an activity for it to qualify as a trade or business. *Id.* at 35. First, the Byrds cite the frequency of their visits to Grand Victoria Casino and Hollywood Casino as indicated in the year-end reports from those casinos. As noted, the reports from Grand Victoria Casino specify the dates the Byrds visited the casino but the reports from Hollywood Casino do not. We calculate that the Byrds averaged 67 visits to Grand Victoria Casino each year between 1999 and 2002. The Byrds suggest that their win/loss figures from Hollywood Casino indicate that they must have visited it at least as often as Grand Victoria Casino. If this is true, then the Byrds averaged 2.57 casino visits per week—comparable to weekend trips, as one might expect since Jerry had full-time employment. (The Byrds do not attempt to estimate the number of their visits to the other casinos they patronized from 1999 to 2002.) By contrast, the respondent in *Groetzinger* visited the dog track six days a week for 48 weeks in 1978. The respondent in *Groetzinger* spent 60 to 80 hours per week at gambling-related

efforts such as research. *Id.* at 24. Perhaps the Byrds as well spent time researching gambling methods, but they did not attempt to estimate the hours they put toward such activity. The Byrds have not shown that they engaged in gambling nearly as frequently as the respondent in *Groetzinger*.

The Byrds caution against a mechanical, point-by-point comparison of the facts here with those in *Groetzinger*. They suggest that the Court in *Groetzinger* did not intend for the particular facts in that case to set the minimum standard for all taxpayers who claim to gamble as a trade or business. They note the Court's emphasis that whether gambling, or any other activity, constitutes a trade or business is a fact-bound, case-by-case inquiry. See *id.* at 36. We understand what the Court meant to convey, but we note that *Groetzinger* is the only decision the Byrds have cited on this issue even though a veritable universe of case law has developed since *Groetzinger* was decided in 1987. We judge the Byrds' argument as it is presented to us, and the Byrds have not convinced us that they pursued their activity with the regularity exemplified in *Groetzinger*.

At the same time, we stress that we are not holding that a taxpayer must devote any certain number of weekly hours to an activity for it to constitute a trade or business. If, however, the taxpayer is spending considerable time away from the activity because the taxpayer is otherwise occupied earning income, then it becomes questionable whether the taxpayer is relying on the activity for "the production of income for a livelihood" (*id.* at 35) as was the respondent in *Groetzinger*.

We recognize that, despite their less than full-time attention to gambling, the Byrds wagered on an enormous scale (nearly $10 million between Hollywood Casino and Grand Victoria Casino alone for the years 1999 to 2002). These expenditures far surpassed those of the respondent in *Groetzinger*. Nonetheless, we cannot agree with the Byrds' assertion that, based on the frequency and sheer enormity of their gaming, it would be "disingenuous" to suggest that their gaming was pursued "for anything other than a profit motive, or expectation of winning at the activity." First, this

claim does not jibe with Jerry Byrd's testimony. Jerry never testified that he and his wife had an income or profit motive for gambling. The sole motive he identified was the pleasure motive. When Jerry was asked why he continued to gamble despite his "substantial losses," he said:

> "We put five kids through college, nobody at home. We make a lot of money at my—my job position and [gambling] is an activity that we enjoy and have enjoyed doing ***."

The Byrds argue that Jerry's admission that he and his wife enjoy gambling is no bar to finding that activity to be a trade or business, because "[e]njoyment of one's profession or career certainly does not make it any less a career." The problem for the Byrds is not simply that they took pleasure in gambling. Indeed, we have no doubt that the Byrds not only enjoyed gambling for its own sake but hoped and—with Byrd's seemingly in-depth knowledge of slot machine mechanics—indeed expected to win. What is required, however, is not simply the hope or expectation of winning but reliance on gambling for "the production of income for a livelihood." *Id.* The Court in *Groetzinger* expressly noted that the respondent gambled "for a livelihood." *Id.* at 36. By contrast, Jerry's testimony revealed not that gambling was the Byrds' means of support but, conversely, that Jerry's substantial wages supported a lifestyle that included lavish wagering. Jerry acknowledged that his income for the years in question came primarily from his wages. He also acknowledged that the money he and his wife spent on gambling came from his wages. Jerry never claimed that his wagering was subsidizing itself let alone supporting him and his wife. The Byrds' almost ghastly losses for 1999 to 2002 would belie that claim, in any case.

We recognize that even an unprofitable activity may constitute a trade or business, and we are not evaluating the Byrds' claim by their overall lack of success at gambling for 1999 to 2002. Even in *Groetzinger* the gambling had "a less-than-successful result." *Id.* Yet, however unwise it

might have been in retrospect, the taxpayer in *Groetzinger* did in 1978 rely on gambling for a livelihood as he had no other employment. The same cannot be said of the Byrds. Perhaps the Byrds in 1999 to 2002 were contemplating a future run at gambling for a livelihood, but it is clear that they had not yet taken that step but were still relying on Jerry's wages.

So far we have based our analysis exclusively on the relatively brief discussion in *Groetzinger*, for that is all the Byrds rely on. In fact, a large body of authority has developed since *Groetzinger* that seeks to amplify and formalize, in the context of gambling, the criteria the Court set forth. The Department cited this authority in its response brief, but the Byrds filed no reply brief and hence never addressed it. We have found no case in this post-*Groetzinger* outgrowth finding a taxpayer's gambling to constitute a trade or business where the taxpayer continued to pursue another occupation, devoting substantial time outside of gambling to earning income. Compare *Merkin v. Commissioner*, 95 T.C.M. (CCH) 1576, 1580 (2008) (taxpayer was employed as a physician and did not rely on his gambling winnings to support himself and his wife but, instead, the disposable income from his medical practice allowed him "to cover the expenses associated with two residences as well as [his] spending while at Mohegan Sun [Casino]"), and *Calvao v. Commissioner*, 93 T.C.M. (CCH) 988, 990 (2007) ("Unlike the taxpayer in *Groetzinger*, petitioner spent approximately 20 to 25 hours per week working [as president of] Caltex. Additionally, petitioner's livelihood did not depend on playing the slot machines. His primary income came from his salary of $42,000 and the passthrough of income of $99,790 from Calltex ***."), with *Chow v. Commissioner*, 99 T.C.M. (CCH) 1193, 1196 (2010) ("Petitioners *** were retired, and the record suggests that the sale of [their rental property] eliminated a substantial source of rental income. Petitioners' other income would not permit petitioner to sustain [the gambling] losses indefinitely in the future. Petitioners' situation is distinguishable from cases *** in which other sources of income allowed taxpayer to pursue an

activity as a hobby, without expectation of profit."), and *Busch v. Commissioner of Revenue*, 713 N.W.2d 337, 348 (Minn. 2006) (taxpayer's "income came entirely from other sources, specifically her savings and retirement funds, but she had no occupation other than her claimed gambling occupation during the relevant tax years. This suggests that [taxpayer] intended to devote herself to gambling as a possible means of earning a living and was simply unsuccessful in making any money.").

We conclude that, because the evidence shows that the Byrds did not devote themselves full time to gambling but that Jerry Byrd continued to work full time in the graphic arts industry where he drew a comfortable salary that supported the Byrds' gambling, there was no clear error in the Department's determination that the Byrds' gambling activity was a pastime, not a trade or business.

Next, the Byrds claim that, even if their gambling was recreational, they are nonetheless entitled to a deduction for their gambling losses. The Byrds concede that section 203 of the Act contains no provision for a deduction for gambling losses. The Byrds, however, claim on various grounds that it would be unconstitutional to deny them the deduction. Many of these contentions are devoid of analysis or citation to legal authority and therefore are forfeited for appellate review. See Ill. S. Ct. R. 341(h)(7) (eff. Sept. 1, 2006) (appellant's brief "shall contain the contentions of the appellant and the reasons therefor, with citation of the authorities *** relied on," and "[p]oints not argued are waived"); *Palm v. 2800 Lake Shore Drive Condominium Ass'n*, 401 Ill. App. 3d 868, 881 (2010) (" 'The well established rule is that mere contentions, without argument or citation of authority, do not merit consideration on appeal.' [Citation.]"). The remainder are marginally developed and can be disposed of in short order.

"Statutes carry a strong presumption of constitutionality." *Arangold Corp. v. Zehnder*, 204 Ill. 2d 142, 146 (2003). "The party challenging a statute carries the burden of rebutting that presumption and 'clearly establishing' its unconstitutionality." *Id. (*quoting *Russell v. Department*

*of Natural Resources*, 183 Ill. 2d 434, 441 (1998)). A reviewing court has a duty to uphold the constitutionality of a statute whenever reasonably possible. *Id.*

The Byrds claim first that substantive due process principles dictate that Illinois grant them a deduction for their gambling losses. They assert that the Act is unconstitutional on its face in denying any taxpayer a deduction for losses incurred in recreational gambling. They alternatively claim that the Act is unconstitutional as applied to them and their particular gambling losses.

The Byrds, however, make no effort to distinguish their facial challenge from their as-applied challenge. They cite no law on the difference between the two types of challenges, though the distinction is fundamental. "An 'as-applied' challenge represents a plaintiff's protest against how the statute was applied in the particular context in which the plaintiff acted or proposed to act, while a 'facial' challenge represents a plaintiff's contention that a statute is incapable of constitutional application in any context." *Lamar Whiteco Outdoor Corp. v. City of West Chicago*, 355 Ill. App. 3d 352, 365 (2005). "This distinction is important because facts surrounding the plaintiff's particular circumstances are relevant only in an as-applied challenge." *Id.*

In fact, the Byrds support their due process claims with nothing more than citations to general standards governing due process challenges to statutes. Notably, the Byrds do not claim membership in a suspect class or assert that a fundamental right is at stake, but invoke the least exacting of the due process standards, that of "rational basis review" (*Arangold Corp.*, 204 Ill. 2d at 147). Under this test, the enactment "must bear a rational relationship to the public interest sought to be served and the means adopted to accomplish the goal must be reasonable." *Id.* Rational basis review is limited and highly deferential. *Id.* "As long as there is any reasonably conceivable state of facts showing that the legislation is rational, it must be upheld." *Id.* "Whether a statute is wise or whether it is the best means to achieve the desired result are matters left to the legislature, not the courts." *Id.*

Though we would be justified in rejecting the Byrds' due process claims for lack of development because it is not our obligation to act as advocate for a party or to search the record for error (*U.S. Bank v. Lindsey*, 397 Ill. App. 3d 437, 459 (2009)), we will nonetheless briefly review them. For their facial challenge, the Byrds appear to make two related claims: (1) the absence of a deduction for gambling losses bears "no reasonable relationship to any realistic concept of income" because, to the extent that losses offset winnings, "there is no accretion to wealth"; and (2) the Illinois tax scheme results in "double taxation," because the taxpayer who gambles is "not even allowed to deduct the additional capital deriving from his employment income, which is already taxed at both the state and federal levels."

We can readily dispose of the second claim. By "double taxation," the Byrds appear to mean taxation of that portion of their winnings that represents their winning wagers. This claim is misconceived. Gambling winnings that represent the return of capital are not taxable under federal law and thus are excluded from gross income, before adjusted gross income is determined. See *Hochman*, 51 T.C.M. (CCH) at 313. As explained above, federal adjusted gross income is the base figure for calculating Illinois tax. While section 203 of the Act contains various add-backs of deductions or exclusions recognized under federal law, there is no add-back for amounts representing the return of winning wagers (presumably because Illinois, too, recognizes the "distinction between income and the recoupment of capital" (*In re Marriage of Worrall*, 334 Ill. App. 3d 550, 554 (2002))). Thus, if an Illinois taxpayer pays Illinois tax on recovered winning wagers, it is only by his largesse, negligence, or inadvertence. The Act, which follows the federal treatment of gambling winnings, certainly does not *require* an Illinois taxpayer to pay tax on gambling winnings that constitute the return of capital.

The Byrds' other claim, that gambling winnings do not reasonably constitute income to the extent offset by losses, is in reality an attack on the basic concept of income. Under Illinois law, "income represents a gain or profit that is generally understood to be a return on an investment of labor or capital, thereby increasing the recipient's wealth." *In re Marriage of Tegeler*, 365 Ill. App. 3d 448, 455 (2006). Gambling winnings have long been considered income under federal tax law (see *McClanahan*, 292 F.2d at 631-32), and Illinois law has acceded to that characterization by not permitting exclusion of gambling winnings from adjusted gross income as carried over from the federal return. The Byrds, however, contend that, to the extent their winnings are diminished by losses, they are by definition not income. It is perhaps no surprise that the Byrds cite no law by which they would have us upset decades of well-established law. We note that even those who gamble for a profession, such as the Byrds claim to be, must report all gambling winnings (except those that constitute recovery of capital) as income and then, if permitted, claim a deduction for gambling losses. See *id.* (rejecting taxpayer's contention that only gambling winnings that exceed losses must be reported as income). The Byrds, we conclude, have not convinced us of any facial deficiency in the Act.

The Byrds next claim that the Act is unconstitutional as applied to them. They question the fundamental fairness of a tax scheme whereby they "could sustain massive losses in excess of $200,000 during the relevant tax years and still face forfeiture of nearly half a million dollars" (according to the amended NODs). Here again the Byrds cite no authority but simply appeal to this court's sense of fairness. We appreciate the scale of the Byrds' losses in relation to their tax liability, but given our holding that the Byrds gambled as a pastime, not as a trade or business, we find their protests unappealing. The Byrds' losses represent not a failed enterprise of self-support but a simple hobby pursued for the Byrds' pleasure and funded by Jerry Byrd's substantial employment income.

The Byrds describe their activity at the casinos as "pulling handles, pushing buttons, and cycling hundreds of thousands of dollars through those 'one-armed bandits.' " The Byrds knew the risk involved in each button push and each handle pull and could have stopped far short of the losses they ultimately incurred. The Byrds did not need to incur such risks for the sake of long-term gain, for they had ample support already in Jerry Byrd's wages. See *Winkler v. United States*, 230 F.2d 766, 774 (1st Cir. 1956) (noting that one "very real distinction[] between the activities of the professional and the casual gambler" is that the latter "has no inevitable losses"). We reject the Byrds' as-applied challenge to the Act.

Next, the Byrds argue that the Act creates several classifications that violate guarantees of equal protection and tax uniformity. The equal protection clauses of the Illinois and federal constitutions (U.S. Const., amend XIV; Ill. Const. 1970, art. I, §2) provide identical protection. *In re R.C.*, 195 Ill. 2d 291, 309 (2001). Both provisions require "that the government treat similarly situated individuals in a similar manner." *Id.* The tax uniformity clause of the Illinois Constitution (Ill. Const. 1970, art. IX, §2) states:

> "In any law classifying the subjects or objects of nonproperty taxes or fees, the classes shall be reasonable and the subjects and objects within each class shall be taxed uniformly. Exemptions, deductions, credits, refunds and other allowances shall be reasonable."

The uniformity clause imposes a more restrictive limitation on nonproperty tax classifications than do the equal protection clauses of the Illinois and federal constitutions. *Arangold Corp.*, 204 Ill. 2d at 153.

We address first the Byrds' tax uniformity claims. As we hold that the classifications they challenge do not violate tax uniformity, we do not analyze them under the lesser standard of equal protection. See *Geja's Café v. Metropolitan Pier & Exposition Authority*, 153 Ill. 2d 239, 247

(1992) ("If a tax is constitutional under the uniformity clause, it inherently fulfills the requirements of the equal protection clause.").

"To survive scrutiny under the uniformity clause, a nonproperty tax classification must (1) be based on a real and substantial difference between the people taxed and those not taxed, and (2) bear some reasonable relationship to the object of the legislation or to public policy." *Arangold Corp.*, 204 Ill. 2d at 153. "Although the uniformity clause imposes a more stringent standard than the equal protection clause, the scope of a court's inquiry under the uniformity clause remains relatively narrow." *Allegro Services, Ltd. v. Metropolitan Pier & Exposition Authority*, 172 Ill. 2d 243, 250 (1996). "One challenging a nonproperty tax classification has the burden of showing that it is arbitrary or unreasonable, and if a state of facts can reasonably be conceived that would sustain the classification, it must be upheld." *Id.* at 250-51.

The first classification the Byrds challenge is between those who gamble as a trade or business and those who gamble casually or for recreation. As the Byrds note, the Act, though tacitly incorporating the deduction allowed for gambling losses that qualify as business losses, departs from the federal tax code in not permitting a deduction for losses sustained in recreational gambling. The Byrds argue that the federal scheme avoids the "absurdity" of "turn[ing] a blind eye to over $200,000 in gambling losses and impos[ing] a more than $60,000.00 'income tax' on the activity." The Byrds fail to recognize that federal law itself distinguishes between professional gamblers and recreational gamblers and affords the former a more favorable deduction of losses. See *LaPlante*, 98 T.C.M. (CCH) at 307. This distinction has long existed in federal tax law and has withstood constitutional challenge. See *Gajewski v. Commissioner*, 84 T.C.M. (CCH) 980, 983-85 (1985) (rejecting constitutional argument against differential tax treatment of losses incurred in casual and in professional gambling); *Winkler*, 230 F.2d at 774, 776 (noting "two very real distinctions between

the activities of the professional and the casual gambler" and noting that professional gamblers enjoy certain constitutional protections from the taxing power). The Byrds do not engage this case law. They do not dispute the well-entrenched difference between trades or businesses and other activities. They do not challenge the grounds on which courts have distinguished gambling as a trade or business from gambling for recreation. Rather, the Byrds appear to believe that the magnitude of their losses squelches any basis on which they might be distinguished from professional gamblers. Under federal law, however, the distinction between professional and casual gambling exists despite the potential for enormous losses in the course of casual gambling. The Byrds do not address this fact despite their insistence that Illinois mirror the federal system. The Byrds have failed to persuade us that no "state of facts can reasonably be conceived that would sustain" (*Allegro Services*, 172 Ill. 2d at 250-51) Illinois's decision to press the federal distinction further to eliminate any deduction for losses incurred in casual gambling.

The next classification the Byrds claim the Act creates is between different forms of gambling activity. The Byrds note Jerry's testimony that W-2G forms are required for slot machine payouts but not for payouts in table games, and that a player of table games is not allowed to take notes while playing. (Jerry also testified, however, that casino personnel monitor table play and give the player a win-loss tally at the end of the gaming session.) The Byrds argue that the different reporting requirements for gambling winnings amounts to a tax differentiation for which no justification exists. This argument is afflicted foremost by a lack of development. Other than the testimony of Jerry, who was never qualified as an expert on tax law, the Byrds cite no source for their claim that different reporting requirements exist for different forms of gambling. The Department has partially filled the breach by citing authority that the difficulty of tabulating gambling winnings depends on the nature of the gambling activity and affects the nature of reporting requirements. See, *e.g.*, *Shollenberger,*

98 T.C.M. (CCH) at 669 ("This Court has also recognized the practical difficulties of tracking the basis of each wager individually in a series of like play."). The Department also brings to our attention that Treasury regulations require a casino to send Form W-2G to the IRS whenever it makes a payout of $1,200 or more from a slot machine. See Treas. Reg. §7.6041—1 (____).

The Byrds appear to claim that a tax differentiation exists because it is easier to track income from slot machines than from other games, and because the government aids slot machine players in reporting their winnings by requiring casinos to submit W-2G forms stating gambling winnings. This argument fails. We recognize that the players cards the Byrds used at the casinos enable the electronic recording of slot machine activity. No matter, however, the sophistication reached in the recording of certain gambling activities, the government requires all income to be reported. Income can be derived from myriad sources, and the Byrds cite no authority that the government must ensure that all income be tracked with the same ease or else its reporting demands are invalid. As for the W-2G form, which is required for certain slot machine winnings, neither party has cited any authority suggesting that casinos have no like obligation to report winnings from other gambling activities.

The final classification the Byrds attack is between recreational gambling and what the Byrds claim are comparable activities in that "they [all] rely upon utilization of capital in an arena combining both luck and skill with the hope and ultimate goal of achieving a profit from the endeavor." The Byrds mean specifically "stock pickers or day traders, [whose] losses are deductible from gains or payouts." The Byrds, however, do not cite any source for their claims about how stock transactions are taxed. Their challenge would fail in any event. The differential treatment of gambling and other activities has been addressed by the federal courts. Under federal law, gambling losses, whether incurred in professional or in casual gambling, are deductible only to the extent of gambling gains.

26 U.S.C. §165(d) (2006). Rejecting an equal protection challenge to this differentiation, one court has said:

> "There is certainly ample basis for singling out gambling for treatment different from that available to other trades or business. The history of gambling was discussed at length in *Skeeles v. United States*, 118 Ct.Cl. 362, 365-368, 95 F.Supp. 242, 242-44 (1951), tracing it back millennia, as far back as the Talmud, which, the Court noted, 'classes gambling winnings with thievery.' The Court of Claims also recounted moral opposition by churches generally, and discussed anti-gambling legislation over the years. Further, we take judicial notice of the fact that although gambling has many defenders and sponsors, there is also widespread public opposition to professional gambling, and that there is at least some public perception that organized crime has infiltrated the business world of gambling." *Valenti v. Commissioner*, 68 T.C.M. (CCH) 838, 841 (1994).

We think these concerns over the nature of gambling justify Illinois not only in tacitly following the federal model by limiting the deduction for the losses of professional gamblers, but also in denying any deduction for the losses of recreational gamblers.

The Byrds' final argument is that the Department erred in cancelling the amended NODs as based on incompetent evidence: the casino reports that were, by the casinos' own acknowledgment, not definitive accounting documents. This, of course, is a dangerous argument for the Byrds to make since the amended NODs claim a substantially higher tax deficiency than the original NODs. At the risk of being paternalistic, we venture that the Byrds do not really want the amended NODs reinstated but simply want the Department forced to embrace the logical conclusion of its reading of the Act. They claim the Department cancelled the amended NODs disingenuously:

"[The Byrds] respectfully submit that it was only by finding the year[-]end summaries unreliable that the Administrative Law Judge was able to avoid imposing over a half million dollars of tax liability upon taxpayers who could demonstrate actual losses in excess of $200,000.00.

* * *

*** Perhaps the ALJ and Department were trying to cut the [Byrds] a break at the expense of the public treasury. It is more likely, however, that they believe they have a far better chance convincing a tribunal which does have the power to declare absurdities like this unconstitutional if the [Byrds] are only being taxed an additional $100,000.00 in penalt[ies] and interest as opposed to half a million dollars. In other words, by lessening the impact of the outcome to the taxpayers, they increase their odds that the patent unfairness of this taxation scheme will be less apparent to this Court."

We are at a loss to see how one can "respectfully" make such remarks. As in their prior arguments, the Byrds couple their bombast with virtually no citations to legal authority. The Byrds criticize the Department for cowardly refusing to face the "absurdity" of taxing the Byrds on every coin paid out to them by the machines, but the Byrds have not demonstrated why that outcome would be absurd. In any case, since the Department adopted the ALJ's ruling and the Byrds' challenge is tongue-in-cheek, we do not review the ruling.

For the foregoing reasons, we hold that the Department did not err in determining that the Byrds' gambling activity did not meet the criteria of a trade or business and that they were not otherwise entitled to a deduction for their gambling losses. We therefore confirm the decision of the Department.

Confirmed.